[No. D039117. Fourth Dist., Div. One. Mar. 8, 2002.]

KIMBERLY R., Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Real Party in Interest.

1068

**COUNSEL**

Judith Klein for Petitioner.

No appearance for Respondent.

John J. Sansone, County Counsel, Susan Strom, Chief Deputy County Counsel, and Gary C. Seiser, Deputy County Counsel, for Real Party in Interest.

Steven J. Carroll, Public Defender, Henry C. Coker, Chief Deputy Public Defender, and Armando P. Salazar, Deputy Public Defender, for Minor.

**OPINION**

McINTYRE, J.—Kimberly R., mother of six-year-old dependent Arthur V., challenges the juvenile court's procedure denying the San Diego County Health and Human Services Agency's (Agency) request to dismiss a supplemental petition and allowing minor's counsel to pursue the petition. Kimberly also claims insufficient evidence supports the court's true finding on the supplemental petition that removed Arthur from her custody. We decide the Agency may not unilaterally dismiss a supplemental petition it filed to remove a dependent child from a parent's physical custody over the objection of minor's counsel. Upon an objection, the Agency must show that dismissal is in the interests of justice and welfare of the child. Here, the court followed an unauthorized trial procedure but the error was harmless. We agree with Kimberly the true finding is not supported by substantial evidence and grant the petition.

### FACTUAL AND PROCEDURAL BACKGROUND

In the past, Kimberly abused heroin and cocaine and was diagnosed as bipolar with schizo-affective disorder. In June 1999 a deputy sheriff found

Arthur, then nearly three years old, unsupervised in Kimberly's apartment. Kimberly's brother was passed out from alcohol on the sofa and Kimberly later arrived intoxicated. The court declared Arthur a dependent on June 30, 1999, based on Kimberly's inability to care for him due to mental illness and/or alcohol abuse. (Welf. & Inst. Code, § 300, subd. (b); all undesignated statutory references are to the Welfare and Institutions Code.) Arthur remained in Kimberly's physical custody. Her case plan required her to participate in Substance Abuse Recovery Management System, an intensive family preservation program, therapy, medication monitoring and a psychological evaluation.

Kimberly hospitalized herself in September 1999 to stabilize her medications and emotional state and Arthur spent five days in protective custody. Kimberly's psychiatrist wrote she was capable of caring for Arthur. On November 18, 1999, the court sustained a supplemental petition that Kimberly admitted she was not then able to care for her son. The Agency reported Arthur is a "special needs" child and Kimberly was overwhelmed by her mental condition. The court placed Arthur with his paternal uncle Arthur V.

In May 2000 Kimberly's "dual recovery" program specialist reported Kimberly benefited from the program and would graduate in August 2000. Kimberly's drug tests were negative, she gained insight and showed "progress in all aspects of her life." The specialist anticipated Kimberly could maintain her mental health with medication and support groups.

For the 18-month review hearing, the Agency reported Kimberly made significant progress with her case plan and had successful visits with her son. She participated in intensive therapy and was stable and taking her medications. On April 26, 2001, the court returned Arthur to Kimberly's custody, continuing him as a dependent.

The Agency filed a second supplemental petition on September 21 alleging Kimberly was no longer able to provide adequate care for Arthur because she "failed to pick up the child from school on September 17, 2001. The maternal [sic: paternal] aunt went on to the mother's home on September 17, 2001 after she had picked up the child from school and found the mother incoherent and moaning."

Kimberly told the social worker that she was delayed by traffic on her way to Arthur's school. She stated she was taking Vicodin prescribed for a neck injury. A urinalysis test taken on September 18 was negative. The court detained Arthur with Uncle Arthur and his wife, Andrea V. In October the

Agency assessed Arthur as at risk due to Kimberly's history of drug and alcohol abuse and her bipolar disorder. It requested termination of Kimberly's services and a permanent plan for Arthur.

Kimberly's psychologist, Gordon Renwick, reported in October that Kimberly is "extremely committed to her sobriety" and copes well despite having a major psychiatric diagnosis. Dr. Renwick treated Kimberly biweekly for eight months and never observed evidence of psychotic, suicidal or homicidal ideation. Kimberly was stable on her medication and "presented as a very loving, concerned mother."

Neuropsychologist John Fontanisi, treated Arthur and determined he does not have vigilance or attention deficit disorder but is "an anxious little boy unsure of his circumstances." He recommended continuing family counseling. Dr. Fontanisi reported Kimberly manifested manic behavior on two occasions but is open about her problems and in active treatment.

On October 29 the Agency requested dismissal of the second supplemental petition. Minor's counsel objected and the court set a "contested adjudication and disposition hearing."

*November 13, 15 & 16 Hearing*

At the outset of the hearing, the court cited *Allen M. v. Superior Court* (1992) 6 Cal.App.4th 1069 [8 Cal.Rptr.2d 259] (hereafter *Allen M.*), stating, "[T]he way this works is essentially it is [minor's counsel's] case in chief. It's his burden of proof. It's essentially an O.S.C. why the petition should not be dismissed." The Agency indicated it could not prove the facts to support the supplemental petition and asked for dismissal.

Testifying as minor's adverse witness (Evid. Code, § 776), Kimberly stated she was addicted to heroin but has been in recovery for six years. She takes medication for her mental illness and does not believe her illness impairs her ability to care for Arthur. Kimberly usually retrieves Arthur from day care between 5:00 p.m. and 6:00 p.m. On September 17 Kimberly went to the beach with her friend David B. They stopped at her friend Shari's house but she was not home. Kimberly and David left the beach area at 4:45 p.m. to retrieve Arthur but were late because of traffic. At 6:20 p.m. she found a note at the day care stating Andrea was called to pick up Arthur. Kimberly telephoned Andrea at 6:25 p.m. and offered to have David retrieve Arthur. Andrea objected and said she would bring him home.

Kimberly took Vicodin the morning of September 17 as prescribed for a whiplash and concussion she suffered in a car accident. She takes Depakote three times a day, including at 7:00 p.m. on September 17. Kimberly estimated Andrea arrived with Arthur around 8:30 p.m. She disputed Andrea's statement that she was incoherent and moaning. Kimberly said she had fallen asleep on the sofa. She explained her grogginess as the result of the whiplash, concussion and exposure to the sun. She was told exposure to sun could cause side effects while taking Depakote.

Kimberly testified she and Andrea had problems with each other in the past and Andrea was condescending. Kimberly let Arthur go with Andrea because she was "fearful." Andrea called her later that night and informed her that she had called the social worker and Kimberly would not be allowed to pick up Arthur until she drug-tested.

David B. testified he is a recovering methamphetamine addict and met Kimberly at a Narcotics Anonymous meeting. He has been in recovery over eight years. He is a truck driver based in Tucson and visits Kimberly several times a year. On September 17 he and Kimberly drove to the beach around noon. They did not consume any alcohol or controlled substances. They left about 4:45 p.m. to pick up Arthur but were delayed in traffic.

David testified when Andrea arrived with Arthur around 8:00 p.m. he was watching television and Kimberly was asleep on the sofa. Arthur came in and gave his mother a hug and tried to wake her for 10 to 20 seconds. Andrea said she could not leave Arthur with Kimberly "in that condition" and to call her the next morning. Kimberly got up from the sofa and talked with Andrea. Minutes later Andrea said she was taking Arthur and Kimberly said "Okay." David did not think there was anything wrong with Kimberly's condition such that she could not care for Arthur. Kimberly thought Andrea wanted Arthur to spend the night and she would get him back in the morning.

Andrea testified she is a licensed vocational nurse. She married Arthur's paternal uncle in October 2000 and cared for Arthur until April 2001. She does not consider herself related to Kimberly. On September 17 Kimberly called her at 7:00 p.m. and her speech sounded slurred. Kimberly asked if she could have a friend pick Arthur up. Andrea said no, that she wanted to see Kimberly because she "didn't sound very good."

Andrea took Arthur to Kimberly's home about 7:15 p.m. She saw Kimberly facedown on the couch. Arthur went to Kimberly and said, "Mommy,

I'm home" and tried to awaken her for 10 minutes by patting her. Andrea said Kimberly was crying and moaning and told Arthur to leave her alone. Kimberly called out the name "Shari" while facedown on the couch. Andrea led Arthur to the door, telling David to "please let [Kimberly] know when she comes out of it that I have him."

Andrea testified Kimberly "shot up off the couch" and said, "I thought you were Shari." Kimberly looked disheveled but did not smell of alcohol. Andrea said, "I can't leave [Arthur] with you like this." Kimberly replied, "I know." Andrea testified she assumed that Kimberly "screwed up by taking the drugs or alcohol." Kimberly told her she had been asleep because she had taken Vicodin and Valium. Andrea left and called Child Protective Services and the social worker.

Andrea said her relationship with Kimberly is "strained." When Arthur was returned to Kimberly in April 2001, Andrea was concerned that Kimberly "would be able to keep it together."

Uncle Arthur testified he listened to Andrea's telephone conversation with Kimberly on September 17. He interrupted after 15 minutes and asked Kimberly "28 times or so" if she were on medication or if she had been drinking. Kimberly said she was taking Vicodin and Valium. Uncle Arthur thought she seemed disoriented.

Social worker Jose Trevino testified as an adverse witness. Trevino filed the second supplemental petition and believed then that Arthur was at risk. At the time of the hearing, Trevino did not believe there would be specific risks to Arthur if he were returned to Kimberly. Kimberly explained to Trevino she was not responsive on September 17 because she had been sleeping. Trevino is aware Kimberly takes prescription medication but he is not concerned about her relapsing on heroin or alcohol. Kimberly's psychiatrist informed Trevino the medication Depakote may cause episodes of somnolence or severe fatigue.

*Ruling*

The court noted Kimberly is "well aware" of her mental illness and "does everything she can to control it." It also noted Kimberly has a history of substance abuse and mental illness. The court questioned why Kimberly did not go directly to the paternal uncle's house to retrieve Arthur, although it acknowledged the paternal aunt and uncle dislike her and she feared them. It noted, "[S]omething happened that night, and no one has explained to me what happened that night."

The court stated that Kimberly took Depakote and "passed out" and was not able to care for Arthur. It speculated her tardiness in retrieving Arthur on September 17 was the result of doing "something" or "something happened" to put her "into a trance." The court "guess[ed] it was some kind of over-medication, or some kind of combination of drugs that shouldn't have been taken. . . . The evidence is overwhelming in [the court's] mind that something fishy went on." Stating it would have a "problem making a true finding" if this petition were original, the court noted Arthur had "been in the system since 1998," found the petition true, removed Arthur from Kimberly's custody and terminated her services.

This petition followed. (§ 366.26, subd. (*l*); Cal. Rules of Court, rule 39.1B; all rule references are to the California Rules of Court.) We issued an order to show cause, county counsel and minor's counsel responded and the parties waived oral argument. We review the petition on the merits.

### DISCUSSION

*Overview*

Critical distinctions exist between the various petitions filed in the juvenile court. A section 300 "original" petition is filed by the agency to commence a proceeding to adjudge a child a dependent of the court. (§ 325; rule 1403(c).) A section 342 "subsequent" petition is filed by the agency to allege new facts or circumstances about a current dependent child that constitute an additional ground to adjudge the child a dependent. (Rule 1430(b).) A section 387 "supplemental" petition is filed by the agency to obtain an order to remove a dependent child from the physical custody of his or her parent and to direct placement out of the home on a showing "that a previous disposition has not been effective in the protection of a child . . . and seeks a more restrictive level of physical custody." (Rule 1430(c).) A section 388 petition for "modification hearing" may be filed by the agency, a parent, an interested person or the dependent child or the child's attorney to request a hearing to "(1) [c]hange, modify, or set aside an order previously made; or [¶] (2) [t]erminate the jurisdiction of the court . . ." upon a showing of change of circumstance or new evidence. (Rule 1430(d) & (e).)

*Procedure*

■ Here the Agency filed a section 387 supplemental petition on September 21 to remove Arthur from Kimberly's custody, alleging she was no longer able to provide adequate care for Arthur because four days earlier

she failed to pick him up from school and Arthur's aunt found her at home "incoherent and moaning." A month later, the Agency asked to dismiss the petition.

Kimberly argues the Agency should have the right to dismiss a section 387 petition if after investigation it determines the evidence it initially relied upon is unreliable or insufficient. Kimberly notes dismissing the section 387 petition does not divest the juvenile court of jurisdiction and minor's counsel may file a section 388 petition if counsel believes the child should be removed from the parent.

The Agency argues a section 387 petition concerns placement, not jurisdiction, and thus it agrees with Kimberly that summary dismissal was authorized and a section 388 petition is minor's counsel's remedy. The Agency claims the court erred in allowing minor's counsel to proceed on the Agency's petition, but any error was harmless because "[w]hat [minor's counsel] would have had to prove under section 388, subdivision (a), for modification of the court's placement order and removal of the child was essentially the same as what the Agency would have had to establish under section 387. The standard of proof for removal under both sections is clear and convincing evidence . . . ."

Minor's counsel contends he had the right to object to the dismissal and present evidence and the most expedient and effective way to protect Arthur was to proceed on the section 387 petition rather than dismissing and refiling under section 388. The parties rely upon or distinguish our opinion in *Allen M.* to support their respective positions.

In *Allen M.* the agency sought to dismiss its first petition that alleged sexual abuse by the father (§ 300, subd. (d)) because the parents agreed to admit to a second petition alleging violent confrontations in the home (§ 300, subd. (b)). (*Allen M., supra,* 6 Cal.App.4th at pp. 1071-1072.) Minor's counsel objected to dismissal and the court determined minor's counsel had the "obligation to proceed" on the sexual abuse petition. (*Id.* at p. 1072.) We decided the agency does not have an absolute right to dismiss an original petition (or one of several bases for jurisdiction) over objection of minor's counsel. Although the agency has sole discretion to file a dependency petition, once it has exercised that discretion it cannot then divest the juvenile court of jurisdiction and potentially jeopardize the welfare of the minor. (*Id.* at p. 1073.) When minor's counsel objects to dismissal, the proper procedure is a hearing on an order to show cause requiring

the agency to establish why the petition should be dismissed. Minor's counsel may present evidence and make recommendations to the court to assure the most appropriate resolution for the minor, but does not step into the shoes of the agency. (*Id.* at pp. 1074-1075.)

■    Unlike an original petition, a section 387 supplemental petition does not affect the jurisdiction of the court. However, the supplemental petition can have the same drastic result of removing the dependent child from his or her custodial parent. The standard for removal on a supplemental petition is the same as removal on an original petition: the agency must show by "clear and convincing evidence . . . [t]here is a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor" if left in parental custody "and there are no reasonable means by which the minor's physical health can be protected without removing the minor from [parental] physical custody." (§ 361, subd. (c)(1); *In re Paul E.* (1995) 39 Cal.App.4th 996, 1000-1003 [46 Cal.Rptr.2d 289].)

■    A section 388 petition may seek any conceivable change or modification of an existing order. The petitioner must first show in pleadings that "the best interests of the child may be promoted by the proposed change of order" before the court will conduct a noticed hearing. (§ 388, subd. (c).) The petitioner must then prove by a preponderance of the evidence that there is new evidence or changed circumstances that make the change of order in the best interest of the child. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 [27 Cal.Rptr.2d 595, 867 P.2d 706].)

Although a section 388 "modification hearing" petition can ultimately result in removing a child from parental custody (on the higher clear and convincing standard), it is not the functional equivalent of a supplemental petition.    ■    From both proof and practical standpoints, we reject the proposition advanced by both the Agency and the mother that a party objecting to dismissal of a supplemental petition must petition under section 388. The Agency has the authority and obligation to investigate circumstances of risk to a dependent child. The parents, interested parties and counsel for the child do not have the same investigative ability.

If the agency asks the court to remove a dependent child from a parent by supplemental petition and then changes its position, upon objection by minor's counsel the agency should be required to show what evidence its investigation revealed before dismissal. Section 350 provides that at any hearing at which the agency bears the burden of proof, the agency *and minor's counsel* will present evidence before it determines if the burden of proof has been met. As in *Allen M.*, the court should decide if dismissing a

supplemental petition is in the interest of justice and welfare of the child. (*Allen M., supra,* 6 Cal.App.4th at p. 1074.) We conclude the court here should have required the Agency to show cause why the supplemental petition should be dismissed.

Kimberly does not claim she was denied due process by the procedural error. The Agency contends the error was harmless because the court applied the requisite standard of clear and convincing evidence. We note the court admitted the Agency's various reports and that many witnesses were thoroughly examined in the course of a full evidentiary hearing. We conclude Kimberly was afforded her trial rights and the procedural error was harmless. (See *In re Patricia T.* (2001) 91 Cal.App.4th 400, 404 [109 Cal.Rptr.2d 904].)

*Sufficiency of the Evidence*

■ Kimberly contends insufficient evidence supports the order removing Arthur from her custody because there was no evidence she relapsed, abused prescription drugs or used alcohol. She acknowledges having a mental illness and emphasizes she manages her mental health and takes the prescribed medication. Kimberly argues in order to remove Arthur based on her mental illness, expert testimony was required to show that her behavior adversely affects Arthur or jeopardizes his safety.

■ On a challenge to an order removing a dependent child from his or her parent, we are limited to whether the order is supported by substantial evidence. We view the record in the light most favorable to the order and decide if the evidence is reasonable, credible and of solid value. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53 [82 Cal.Rptr.2d 426].)

■ The facts alleging Arthur is not adequately protected in his mother's custody are that one day Kimberly failed to retrieve him from day care and she was later found incoherent by Andrea, his paternal aunt and former caretaker. The court found the petition true and removed Arthur, finding "something happened that night" to put Kimberly in a "trance." It "guess[ed]" Kimberly was overmedicated and "something fishy" transpired. The court did not give its reasoning as to why Arthur's physical and emotional well-being were in substantial danger if he ·continued in his mother's physical custody. Rather, the court improperly viewed the hearing as one on additional jurisdictional facts.

Arthur was six years old when the Agency filed the supplemental petition and had been in Kimberly's care for the previous five months. On this

record, the only time Arthur was out of her care was when he was placed with relatives for 17 months.

Kimberly has a major mental illness but manages it with medication and psychiatric and psychological supervision. The health professionals believe she is committed to sobriety and can adequately parent Arthur. Her psychologist described Kimberly as a loving and concerned parent. Harm to a child cannot be presumed from the mere fact the parent has a mental illness. (*In re Jamie M.* (1982) 134 Cal.App.3d 530, 540 [184 Cal.Rptr. 778].) The question is whether the parent's mental illness and resulting behavior adversely affect the child or jeopardize the child's safety. (*Ibid.*)

Kimberly presented evidence she no longer uses illegal drugs or alcohol and complies with her case plan. The social worker did not believe Arthur was at any specific risk with Kimberly or that she was in danger of relapse. He testified Arthur is bonded to his mother.

Kimberly explained she arrived 20 minutes late to retrieve Arthur because of traffic. She thought her grogginess resulted from a whiplash and concussion she suffered in an earlier automobile accident, combined with Depakote and exposure to the sun. Although Kimberly recalled taking prescription pain medication that morning, her drug test the following day was negative. Kimberly's friend David corroborated Kimberly's account of events and that she was able to care for Arthur.

The court relied upon Andrea's assumption that Kimberly was "passed out" after using drugs or alcohol. That evidence was contradicted by the urinalysis test. The court also questioned Kimberly's decision to call Andrea's home rather than drive there directly from day care. Given the admitted animosity between Andrea and Kimberly, that decision was not irrational.

A single instance of parental tardiness in retrieving a child from a supervised setting does not pose a substantial risk of harm to the child and is not an uncommon occurrence. Parental grogginess, somnolence and severe fatigue are a part of life in families with small children. We conclude there is no substantial evidence supporting the order removing Arthur from Kimberly's custody.

DISPOSITION

Let a writ issue directing the superior court to vacate its order removing Arthur from Kimberly's custody, terminating services and setting a

permanency hearing and enter a new order denying the supplemental petition. This opinion is final immediately as to this court. (Rule 24(d).)

Kremer, P. J., and O'Rourke, J., concurred.